Case number 21-3863, Court Corwin et al. v. ViewRay Inc. et al. Oral argument is not to exceed 15 minutes per side. Mr. Vaughn, you may proceed for the appellant. Good morning. May it please the Court, I'm Zachary Vaughn on behalf of the Appellant, Plymouth County Retirement Association. I'd like to reserve three minutes for rebuttal. Also, at the outset, I'd like to thank the Court for its accommodation in allowing me to appear remotely this morning. Sorry for any confusion this might cause. This case concerns ViewRay's order backlog for its only product, a medical device called the Meridian. More specifically, it concerns defendants' repeated public representations that their decisions about which orders could be included in the backlog would be governed by a set of criteria that we've called the backlog criteria. It's become clear that this appeal turns almost entirely on one question. How would a reasonable investor who read these criteria have understood how to govern orders from Meridian that ViewRay received indirectly from third-party foreign distributors? Now, if defendants are right, and the only possible reading of the criteria is that a third-party order could be added to the backlog even without a contract signed by a real end-user, or even without any real end-user at all, then this Court can affirm. But if instead, if it's possible that a reasonable jury could agree without a reading that the criteria permitted defendants to add third-party orders to the backlog only if they distributed a signed contract with an end-customer. Just let me ask you, how do we know that this whole case turns on issues about how the backlog was compiled or what the disclosures about the backlog of the orders of this machine happened to be? In other words, if there are allegations here that the stock price was overstated or compromised based on the backlog, what is the evidence that connects the backlog to the permutations of the stock price? Why is, you're saying that's the only issue. How do we know the stock price is changing based on how this backlog came into existence and what representations were made about the backlog? Well, I'll tell you, Your Honor. I suppose I should have clarified that the only issue with respect to the falsity and the censure allegations. But you're right. There's a separate issue of loss causation. That's true. And there are two separate theories of loss causation this Court's recognized. Materialization of the risk and corrective disclosure. And this Court's explained that to show loss causation, you need to show two things. You need to show a relationship between the risks and a close correlation between the materialization of the risk and this fall in the stock price. And here, we've shown that there's such a direct relationship. The risk that defendants concealed from the market was that their disregard for the backlog criteria. Again, on our reading, which we think is the right one, and we think it's possible for a jury to agree that their disregard for these criteria increased the likelihood that backlog orders from third-party distributors might fail to close and become revenue. And that's, in fact, just what happened in August 2019 when V-Ray disclosed that a foreign third-party distributor had been unable to fulfill two orders. And that caused the company to miss its earning guidance for the quarter, and then the stock dropped 54% the very next day. That's the loss causation allegation. That's also, by the way, we think that's also a correct disclosure. Well, if that was the big issue, that would not satisfy the requirements of the Private Litigation Securities Act. Because we're hearing a motion to dismiss, so the issue is whether your pleading is sufficient. This is not summary judgment. And if that's all that you have to offer, that the stock price went down and there were some changes in the backlog, and that's the only alleged misrepresentation or the principal misrepresentation. That doesn't satisfy the pleading requirements, and then the court would have been correct in dismissing because your pleadings were deficient. What do you have to say about that? The principal misrepresentation in this case is for defense to have promulgated the set of backlog criteria, which states that a third-party distributor order could only and would only be ever added to the backlog if it were paired with a signed contract by a real actual end user of the device. To promulgate these criteria, and yet, in practice, not to do so. To, in fact, add orders to the backlog from these distributors without such a contract. In fact, sometimes, to go so far, we have allegations in the complaint that defendants went so far as to collude with third-party distributors to create sham orders for which there had never been any end customer at all in order to inflate the backlog. So one, the principal misrepresentation is this inflation of backlog through their conduct, and then when you get to the loss causation, it's the risk, the undisclosed risk created by that misrepresentation and the conduct connected with it is that these orders, which the market believed to have been paired with real contracts, thus making it unlikely that they would just kind of disappear, the risk they disclosed was, in fact, because they weren't paired with those contracts, they might, there was a higher likelihood of that taking place, and, in fact, that risk materialized as we allege in 2019. In August 2019, V-Ray disclosed that, in fact, just this had happened, a board distributor had been unable to fulfill two of its orders. And so this caused the company to miss its earnings by the end of the quarter, and that caused a stock drop in the stock price. I'm not sure if that answers your honest question. Well, in terms of trying to meet the elements of the Private Securities Litigation Reform Act, I suppose your opposing counsel would say that there are all kinds of qualified statements in the disclosure documents submitted to the Securities and Exchange Commission indicating that these machines take an enormous amount of time to build and to install. They were talking about 18 to 24 months or more. In other words, there were statements that suggested that you couldn't look forward to, that I would surmise to mean that you couldn't look forward to stability or predictability in the stock price based on the backlog of machines because of the nature of the business and how long it takes to sell these machines and to install them and to train people to use them. But your view is, I take it, somewhat different. You have a different perspective on that. What's your thinking as far as that goes? Yes, Your Honor, I think I would say two things. First, I would disagree to the extent that defendants are claiming that the backlog criteria as promulgated in their statements is itself a forward-looking statement protected by the PSLRA. I would disagree with that. I say that the backlog criteria is a statement of present fact. It's a statement that we currently are following the following criteria and we, as a matter of present fact, are only adding orders to the backlog if they meet these criteria. And second, I would ask the court to look at the Burson case from the Ninth Circuit, which also dealt with a backlog and also included statements from the defendants. Disclosures warning about that quote, might not result in revenue and future changes in delivery schedules and cancellations of orders make the backlog not necessarily representative of actual sales. The Ninth Circuit looked at statements like that and also looked at the omissions of present fact that the defendants had done. And the Ninth Circuit said that the future warnings were insufficient under the PSLRA. Well, I understand that in 2019 the defendant revised their revenue projections and reduced the number of machines and backlog and then the share price declined. It was seen that there were disclosures along the way regarding the status of the backlog, but your argument would be that that was not sufficient in terms of disclosure from the defendant. Is that right? It's true, Your Honor, that each quarter defendants made disclosures to the market about the monetary value of the backlog. But it's another case that they disclosed that, in fact, despite the order back up, which they repeatedly published, I believe in each 10-K area, in any respect on repeated occasion published this set of backlog criteria, it was never disclosed to the market that, in fact, they weren't following these backlog criteria. In fact, their backlog included orders from distributors that had not obtained contracts from actual end users. And I think that's why I believe the case comes down to whether a jury can conclude that the proper reading of the criteria says that they would do that. Because if that's so, then I think as defendants implicitly concede in their, probably where they, if you read the defendant's brief, they consistently say they condition their arguments on their reading of the backlog criteria that, in fact, did not require these things when we think it's possible for a jury to agree that a reasonable investor would think that they did. Is your argument primarily that the criteria of establishing how the backlog would work itself constituted a misrepresentation or misled, or are you saying that the defendant didn't comply with the requirements of the backlog? What's your primary argument here? It's the latter point, Your Honor. It's that defendants published these guidelines to investors, which told them that they would add third-party orders to the backlog only if they were paired with signed contracts by real end customers. But, in fact, they did not comply with those. They secretly, you know, they didn't comply with those guidelines. And so it's, the guidelines themselves are not a misrepresentation, but they are misleading in light of the defendant's failure to disclose that, in fact, they weren't doing these things. And that omission caused their disclosures to be misleading. All right. Any other questions from the panel? All right. You'll have your rebuttal time, and I'll ask the clerk, do you need to turn the clock around, or are we okay? No, we're fine. Okay. All right. Thank you. Good morning, Your Honors. May it please the Court. I'm Monica Lozman with Gibson, Dunn & Crutcher on behalf of the defendants, and I'm joined by my colleague, Allison Costeca, as well as the general counsel for Bure sitting in the back. Your Honors, the district court's dismissal of this litigation with prejudice can be affirmed for three separate and distinct reasons, and that is because appellant has not sufficiently alleged three elements of its securities fraud claim, falsity, see-enter, or loss causation. Let me begin with falsity. Plaintiff's theory of liability depends upon an interpretation of the company's publicly stated backlog criteria that is simply not plausible and, moreover, not consistent with what the company actually told investors. As the district court noted, the company starts its discussion of the backlog criteria by cautioning investors that it is difficult to predict, and I quote here, that will ultimately result in revenue. Indeed, the company cautions that orders included in backlog value may not result in revenue at all. Bure then states that the determination of backlog includes objective and subjective judgment about the likelihood of an order contract becoming revenue. The objective criteria in that analysis are clearly disposed, and there are two parts. The disclosure states that the company must possess both, indicating two items. One, an outstanding and effective written agreement signed by a customer, and then two, a minimum customer deposit or letter of credit except where that deposit or letter of credit requirement is waived or may be waived by the company. The company goes on to state that it performs a quarterly review of its backlog, which orders are in backlog, and removes orders that are no longer expected to result in revenue. There is no time component to this. Backlog, the company expressly tells investors that backlog includes orders that may result in revenue in six months, in 12 months, or in three years. There is no specific time component to when orders in backlog will in fact convert to revenue, if they will in fact convert to revenue at all. As the district court held, the company disclosed its criteria for including orders in the backlog and sufficiently identified discretion and judgment as factors. Now let me turn to plaintiff's interpretation of the disclosure language, and it has shifted a bit over the course of this litigation, so let me begin with the interpretation argued before the district court.  Viewway was required to have a signed agreement with an end customer, full stop. That interpretation, of course, contradicted both the plain text and the specific disclosure language regarding backlog, but also the company's disclosures read as a whole. Again, the disclosure says the company must have two things, those objective criteria, an agreement with a customer, and then a deposit unless that deposit is waived in certain circumstances. Plaintiff's reading of the criteria does not give faith to the distinction between customer and end customer that the company used in its disclosure. It also ignores the word both. It clearly talks about two criteria. But more importantly, it is inconsistent with the company's overall disclosures regarding its customers and how it recognizes revenue, ultimately, from different customer orders. So with respect to distributors, for example, the company is clear. It recognizes revenue on a transaction with a distributor when the system is delivered to the distributor, not when it is installed to an end user that may or may not have a contract with the distributor. And then, of course, with respect to end customers, where the company, Viewway, has a contract directly with the end customer, revenue is recognized upon installation. So plaintiff's proposed interpretation is not in harmony with the overall company's disclosures to its investors. Now on appeal, and particularly in its reply brief, the plaintiff appellant changes course here. They now say that the backlog criteria requires signed agreements with end customers, except in instances where a deposit from a customer may not be required. In other words, it reads the disclosure regarding the circumstances regarding the deposit criteria. As examples, where not even a contract with the company, with anyone, is required to add an order to backlog. That theory of falsity is simply not plausible, Your Honors. In order to get there, again, the appellant ignores the words both, ignores the distinction between customer and end customer, but they also ignore the very beginning of the disclosure, the words where the company says, we evaluate order contracts in determining what is included in backlog. Indeed, plaintiffs concede in their reply brief and in their opening remarks here today, that their interpretation of the company's disclosure language would leave room for orders without any contracts with the company to be validly included in backlog. In a case alleging that the value of backlog was materially overstated, this interpretation necessarily leaves room for the inclusion of oral orders for a $6 million piece of equipment. Not having a contract in hand with either a distributor or an end customer would only logically erode the reliability of the backlog estimate. The standard here is, of course, what a reasonable investor would understand the disclosure to mean, and we submit that as defendant's read of the disclosure. But even if you accept plaintiff's skewed interpretation of the backlog disclosure language, plaintiff still has not adequately alleged falsity here. Again, that is because it is not consistent with what the company discloses with respect to revenue recognition for distributor orders. Now, let me turn to the more specific allegations or what plaintiffs characterize as more specific allegations, I believe supporting both the falsity element and the scienter element of the claim. I believe precision is important here, and I would urge the court to read the allegations contained in the complaint and not merely the plaintiff's argument regarding those allegations. Those are really confined to paragraphs 49 through 64 of the complaint, but not one of these paragraphs demonstrates falsity when compared with the actual backlog criteria. For example, Confidential Witness 1 in paragraphs 50 through 52 of the complaint, that confidential witness is alleged to have stated that distributors placed orders but then had end users back out. Now, that confidential witness is not alleged to have stated that the company lacked a contract with distributors in those situations. It also does not allege that the distributor lacked a contract with an end customer at the time the order was placed in backlog, or whether that was even during the class period. Looking at the allegations or the statements attributed to a Confidential Witness 2, this Confidential Witness 2 said with respect to certain orders from a Chinese distributor that had been in backlog for years. Again, we don't know with respect to those orders whether the Confidential Witness claims there was no contract with the distributor. Certainly, the complaint doesn't include that statement, nor does the complaint say that distributor did not have an end user customer at the time the order was placed in backlog, or even when that order was placed in backlog, or even... Yes, Your Honor. The witness you are quoting, is that something that we should... the court should be looking at since the issue on this motion to dismiss goes to the sufficiency of the pleadings? Is it really germane what individual witnesses have said? In terms of... Your Honor, that's an excellent point. At the motion to dismiss stage, this court should consider statements attributed to confidential witnesses in order to determine... Assuming those statements to be true, in order to determine whether those statements support or demonstrate the plaintiffs have adequately met or adequately pled the elements of their claim. The distinction here is even assuming what the confidential witnesses are alleged to have said is true, it still does not demonstrate that the company's disclosures were in any way misleading to investors. Let alone that any particular defendant knew anything at the company was inconsistent with what was reported externally to investors. In fact, if you closely study each of the confidential witness statements, the plausible... Again, pivoting a bit to the scienter element here, the more plausible inference to be derived from those confidential witness statements are that the defendants believed what they were telling investors. They believed that the backlog included orders that would result in revenue at some point in time. They believed that they were going through a quarterly review process in good faith. The allegations, the statements by the confidential witnesses are consistent with what defendants told investors about their backlog estimate and their process. It's very similar, actually, to the Accurate case which opposing counsel raised in his comments there. And again, that's a Northern District of California case which was required to follow the Burson v. Applied Signal case and did in fact apply that reasoning from the Ninth Circuit. There were 10 confidential witnesses and the quality of the statements attributed to those 10 confidential witnesses were not sufficiently particularized to suggest that any defendant or the company said anything that was inconsistent with what they told investors. That is the same case here with respect to the statements the alleged confidential witnesses are alleged to have made in this case. What criteria are we as the court supposed to use in assessing the veracity of the statements by these confidential witnesses? Well, I think it goes to what weight this court should place on the statements attributed to confidential witnesses. The more detailed, the more particularized, it may be appropriate for a court to place more weight on those confidential witness statements in assuming the allegations to be true and then assessing whether they adequately plead a claim. Here, however, the statements of these confidential witnesses should not be accorded significant weight. While there is some detail, there is reference with respect to for example, Chinese distributors or a Middle East distributor and four orders for a China distributor here and two for a Middle Eastern distributor, there is no time component, for example, to those orders. We do not know when those orders were placed in backlog, whether it was during the alleged class period or whether, in fact, those orders remained in backlog. So while there is some detail included in this complaint, the confidential witness statement should not be afforded particular weight in your analysis because they're not sufficiently detailed. Let me turn then briefly to the CNTER element. Under any of the Hellwig factors that are applied by this court in assessing whether CNTER allegations are sufficiently pled under this PSLRA, really for the same reasons, the allegations fail to plead falsity. They offer no cogent theory of CNTER here, let alone a strong inference of a wrongful state of mind by any of the defendants. The only fair inference from the allegations, as I've said, is the defendants did what they said they would do. With respect to internal reports, the plaintiffs rely on several cases from this circuit, including Daugherty v. Asperian in the Firestone v. Bridgestone case. I submit that the district court's reasoning with respect to those cases is spot on. The mere existence of internal reports does not lead to an inference of CNTER, precisely because here those internal reports, what are described by confidential witness number three, are not alleged to be inconsistent with what was reported to the investing public. The same analysis with respect to the current information element under Hellwig. The core operations, if I might, just focus on that briefly. The plaintiff argues that the significance of Euray's backlog alone is enough to infer CNTER here. That is simply not true. They point to the Burson case, that Ninth Circuit case. That is a very different case where the company's entire revenue base was derived from contracts with government agencies where a stop work order was issued. And the impact of that stop work order was so significant that it caused the company to have to reassign 50 to 70 employees. Those are not the circumstances here. There, CNTER may be inferred. It may be fairly inferred that management knew those stop work orders had been issued. But it's not the same impact or quality alleged in this complaint. And if I may, seeing I have just a little time left, I'd like to end with these final remarks. This company's mission is simply to conquer cancer. The company is very proud of the work that it does. There is a reason that Congress placed an elephant-sized boulder in the path of securities cases like this one. It is not unusual for a small medical device company to suffer a drop in its stock price, particularly on the announcement of unfortunate results in a particular quarter. That's not surprising. That's not securities fraud. This was plaintiff's third attempt at stating a claim. There is simply no reason to disturb the lower court's well-reasoned ruling dismissing these claims with prejudice. This appeal should finally resolve these meritless claims so my client can return to its full life-saving mission. Thank you. Thank you very much. And we will now take rebuttal if there is any rebuttal. Thank you, Your Honor. I guess I just want to make three brief points on the policy point. First, in fact, the U.S. public documents really do draw a clear distinction between distributors and customers. And in the latter, refer really only to actual end-users of the meridian system. I've asked the court to look at Record 60-9, which is at page 1595. It's one of the 10 Qs. It reads, quote, We decide whether to remove an order from our backlog by evaluating the following criteria. Changes in customer or distributor plans or financial conditions, the customer or distributor's continued intent and ability, etc. In fact, the U.S. only recognizes revenue from an order when the meridian system was delivered to the end-customer. The same document, actually, on the same page, quote, Revenue recognition for meridian systems that we install generally occurs when the customer acknowledges that the system operates in accordance with standard process implications. And the customer accepts the installed unit and control of the system is transferred to the customer. For sales of meridian systems for which we are not responsible for installation, i.e., for distributor sales. Revenue is recognized when the entire system is delivered and the control of the system is transferred to the customer. Again, using the same word, customer and customer. By the way, I'd just like to read to the plain language of the backlog. Why do the events you're describing regarding changes in the backlog, why does that amount to actionable misrepresentation under the statute? Again, Judge, because it's not, we're alleging not a specific misrepresentation, we're alleging an omission that caused the defendant's representations to be misleading. That's their publication of the backlog criteria. Alright, maybe you could explain or expand upon that. Well, again, our reading of the backlog criteria, we read it as requiring a contract. I'll just read it in plain language. We must possess both an outstanding and effective written agreement with the delivery of a meridian signed by a customer with a minimum customer deposit or letter of credit requirement except when the sale is to a customer where a deposit is not deemed necessary or customary. Then there's a list of customers that meet that condition and it ends with, quote, indirect channel sales that have signed contracts with any customers. We think a reasonable investor would read this to mean that the use of the word both here means that the accept clause applies to both sub-clauses. And so that means, with respect to third-party distributor orders, it was always the case that someone was required to have a contract that was signed by an end customer, be the bureau itself or the third-party distributor. And so the Fed's decision to publish these guidelines and to tell the market that they would comply by them and yet not to do so means the omission from their public statements that, in fact, they were not complying with these guidelines with these criteria caused the criteria themselves to be misleading. All right. Does that fairly well complete your argument? My time is up. Yes, it does, Your Honor. Thank you. All right. In that event, the case will be submitted and the clerk may adjourn court.